**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| ALYSSA W., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    1:22CV919 |
| | ) |
| MARTIN J. O'MALLEY, | ) |
| Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant.[1] | ) |

<u>**MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE**</u>

Plaintiff, Alyssa W., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Supplemental Security Income ("SSI"). (Docket Entry 1.) The Commissioner has filed the certified administrative record (Docket Entry 7 (cited herein as "Tr. __")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 16 (Plaintiff's Brief); Docket Entry 18 (Commissioner's Brief); Docket

---

[1] On December 20, 2023, President Joseph R. Biden, Jr., appointed Martin J. O'Malley as Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should substitute for Kilolo Kijakazi as Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Entry 19 (Plaintiff's Reply)).  For the reasons that follow, the Court will enter judgment for the Commissioner.[2]

## I.  PROCEDURAL HISTORY

Plaintiff applied for SSI (Tr. 168-74), alleging a disability onset date of February 1, 2016 (see Tr. 168).[3]  Upon denial of that application initially (Tr. 63-73, 86-90) and on reconsideration (Tr. 74-85, 94-96), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 97-100).  Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 38-62.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act.  (Tr. 16-36.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 163-67), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

1.    [Plaintiff] has not engaged in substantial gainful activity since January 6, 2021, the application date.

. . .

_____

[2] On consent of the parties, this "case [wa]s referred to [the undersigned] United States Magistrate Judge [] to conduct all proceedings . . ., to order the entry of judgment, and to conduct all post-judgment proceedings therein." (Docket Entry 13 at 1.)

[3] Notwithstanding Plaintiff's alleged onset date of February 1, 2016, Plaintiff lacked eligibility for SSI benefits until her application date of January 6, 2021 (see Tr. 168).  See 20 C.F.R. § 416.202 (explaining that a claimant remains ineligible for SSI benefits until date he or she files SSI application); 20 C.F.R. § 416.501 (stating that a claimant may not receive SSI benefits for any period that predates first month he or she satisfies eligibility requirements, which cannot precede application date).

2.    [Plaintiff] has the following severe impairments:
obesity,    schizoaffective    disorder    bipolar    type,
borderline  intellectual  functioning  (BIF)  and  somatic
symptom disorder.

. . .

3.    [Plaintiff]  does  not  have  an  impairment  or
combination of impairments that meets or medically equals
the severity of one of the listed impairments in 20 CFR
Part 404, Subpart P, Appendix 1.

. . .

4.    . . . [Plaintiff]  has  the  residual  functional
capacity to perform medium work . . . except can perform
simple    routine    tasks,    and    maintain    attention,
concentration, persistence, or pace to stay on task for
2-hour  periods  during  a  normal  8-hour  workday,  as
required to perform such tasks.  [Plaintiff] requires a
low stress work setting, further defined as work that is
not production pace or quota based, rather a goal-
oriented job primarily dealing with things as opposed to
people; no more than occasional interaction with the
public, supervisors, and co-workers, but no work with the
public as a component of the job such as cashier, sales
or negotiations, however, incidental/casual contact is
not precluded.

. . .

5.    [Plaintiff] has no past relevant work.

. . .

9.    Considering  [Plaintiff]'s  age,  education,  work
experience, and residual functional capacity, there are
jobs that exist in significant numbers in the national
economy that [she] can perform.

. . .

3

> 10. [Plaintiff] has not been under a disability, as
> defined in the . . . Act, since January 6, 2021, the date
> the application was filed.

(Tr. 21-32 (space added) (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of

4

more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any

5

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[4] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174

---

[4] The Act "comprises two disability benefits programs. The Disability Insurance Benefits program . . . provides benefits to disabled persons who have contributed to the program while employed. [SSI] . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

6

F.3d 473, 475 n.2 (4th Cir. 1999).[5]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry.  For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[6]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80.  However, if the

_____

[5] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[6] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

7

claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[7]

## B. Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ erred by failing to build a logical bridge from the evidence of record to the RFC assessment, in violation of case law precedent" (Docket Entry 16 at 2 (bold font and block formatting omitted)); and

2) "[a]t step five, the ALJ erred by failing to resolve apparent conflicts between the VE's testimony and the information in the [Dictionary of Occupational Titles ('DOT')], in violation of [Social Security Ruling] 00-4p[, Policy Interpretation Ruling

---

[7] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions, 2000 WL 1898704 (Dec. 4, 2000) ('SSR 00-4p')] and case law precedent" (id. at 17 (bold font and block formatting omitted); see also Docket Entry 19 at 1-5).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 18 at 3-21.)

## 1. Logical Bridge Between Evidence and RFC

In Plaintiff's first issue on review, she maintains that "[t]he ALJ erred by failing to build a logical bridge from the evidence of record to the RFC assessment, in violation of case law precedent." (Docket Entry 16 at 2 (bold font and block-formatting omitted).) More specifically, Plaintiff faults the ALJ for 1) "improperly increasing [Plaintiff's] burden of proof in requiring that her subjective statements be validated by objective medical support, in violation of new [United States Court of Appeals for the] Fourth Circuit precedent" (id. at 2 (bold font and block formatting omitted)), 2) "ignoring the function report completed by [] Plaintiff's mother, in violation of 20 C.F.R. § 416.929 and Fourth Circuit precedent" (id. at 8 (bold font and block formatting omitted)), 3) "failing to adequately account for [] Plaintiff's limitations in maintaining concentration, persistence, or pace [('CPP')] in the RFC assessment, in violation of Fourth Circuit precedent" (id. at 11 (bold font and block-formatting omitted)), 4)

9

"failing to adequately account for the marked/extreme limitations opined by the examining psychologist, whose opinion the ALJ found persuasive" (id. at 12 (bold font and block-formatting omitted)), and 5) "formulat[ing] a legally insufficient RFC assessment, in violation of Social Security law and Fourth Circuit precedent" (id. at 15 (bold font and block-formatting omitted)).  For the reasons explained in more detail below, all of those contentions lack merit.

a.  <u>Objective Medical Evidence</u>

Plaintiff first maintains that the ALJ erred by "improperly increasing [Plaintiff's] burden of proof in requiring that her subjective statements be validated by objective medical support, in violation of *new* Fourth Circuit precedent."  (Id. at 2 (bold font and block formatting omitted) (italics in original).)  In particular, Plaintiff points out that, "[o]n February 22, 2023, the Fourth Circuit . . . issued a landmark decision" (id. at 3), "hold[ing] that 'ALJs cannot rely upon the absence of objective medical evidence to discredit a claimant's subjective complaints regarding symptoms of . . . [a] disease that does not produce such evidence,'" and that "'depression[ -] particularly chronic depression[ -] is one of those [] diseases'" (id. at 4 (quoting <u>Shelley C. v. Commissioner of Soc. Sec. Admin.</u>, 61 F.4th 341, 361 (4th Cir. 2023) (italics, internal quotation marks, and citation omitted)).  In Plaintiff's view, the ALJ violated <u>Shelley C.</u> by 1) "mischaracteriz[ing] the record by improperly cherry-picking bits

10

and pieces from the record to highlight Plaintiff's good moments and bypassing the bad" (id. at 7), and 2) "relying upon the absence of objective medical evidence to discredit Plaintiff's subjective complaints regarding symptoms of her schizophrenia and chronic depression" (id. at 7-8).

In Arakas v. Commissioner, Soc. Sec. Admin., 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit deemed fibromyalgia a "unique" disease, Arakas, 983 F.3d at 97, with "symptoms [that] are entirely subjective," id. at 96, and noted that "physical examinations of patients with fibromyalgia will usually yield normal results — a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions," id. (brackets omitted). The Fourth Circuit thus held that "ALJs may not rely on objective medical evidence (or the lack thereof) – even as just one of multiple medical factors – to discount a claimant's subjective complaints regarding symptoms of fibromyalgia," because "[o]bjective indicators such as normal clinical and laboratory results simply have no relevance to the severity, persistence, or limiting effects of a claimant's fibromyalgia, based on the current medical understanding of the disease," id. at 97 (emphasis added).

Just over two years later, the Fourth Circuit issued Shelley C., in which the court extended the above-described holding in Arakas to depression, reasoning as follows:

> After acknowledging that [the plaintiff]'s medically determinable impairment could reasonably be expected to

11

cause some of the alleged symptoms, the ALJ determined that [the plaintiff]'s statements relating to the intensity, persistence, and limiting effect of her symptoms were inconsistent with the medical and other evidence in the record. We hold that the ALJ erred in discounting [the plaintiff]'s subjective complaints as inconsistent with the record's medical evidence.

The ALJ's legal error is clear: he could not dismiss [the plaintiff]'s subjective complaints based *entirely* upon the belief that they were not corroborated by the record's medical evidence. The Fourth Circuit has long held that "while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). Indeed, "[b]ecause pain is not readily susceptible of objective proof . . ., the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative." *Hines v. Barnhart*, 453 F.3d 559, 564-65 (4th Cir. 2006). Accordingly, [the plaintiff] was entitled to rely entirely on subjective evidence to demonstrate that her pain was sufficiently persistent and severe to support a disability finding. *See id.* at 564. As described in length above, the record contains no shortage of such evidence.

. . .

In *Arakas*, we held that ALJs could not rely upon the absence of objective medical evidence to discredit "a claimant's subjective complaints regarding symptoms of fibromyalgia *or some other disease that does not produce such evidence*." 983 F.3d at 97 (emphasis added). Today, we hold that depression — particularly chronic depression — is one of those other diseases. . . . Stated differently, symptoms of [major depressive disorder ('MDD')], like those of fibromyalgia, are "entirely subjective," determined on a case-by-case basis. *Arakas*, 983 F.3d at 96 (emphasis added). Ultimately, because of the unique and subjective nature of MDD, subjective statements from claimants "should be treated as evidence *substantiating* the claimant's impairment." *Id.* at 97-98.

Because the ALJ "improperly increased [the plaintiff]'s burden of proof," *id.* at 96, in requiring that her

12

> subjective statements be validated by objective medical
> support, we must find error.

Shelley C., 61 F.4th 341, 360–62 (italics in original) (internal

quotation marks, footnote, and some citations omitted).

A review of the ALJ's decision persuades the Court that the

ALJ here did not violate Shelley C., because he neither

"mischaracterized the record by improperly cherry-picking bits and

pieces from the record to highlight Plaintiff's good moments and

bypassing the bad" (Docket Entry 16 at 7), nor "dismiss[ed the

plaintiff]'s subjective complaints based _entirely_ upon the belief

that they were not corroborated by the record's medical evidence,"

Shelley C., 61 F.4th at 360 (italics in original).

i. Cherry-Picking

Plaintiff makes the following arguments regarding the ALJ's

alleged cherry-picking of the record:

> Here, as in _Shelley C._, the ALJ committed similar errors
> when evaluating [] Plaintiff's subjective symptoms
> associated with her chronic schizophrenia, bipolar type
> with psychotic features. Here, as in _Shelley C._, the ALJ
> improperly cherry-picked the record by only stating that
> Plaintiff's "mental status exam was negative and showed
> her cognitive functions were grossly intact," "she was
> doing better since her Abilify dose had been increased,"
> and she "denied side effects from the medication." (Tr.
> 29.) Critically, however, the ALJ failed to explain that
> this same purported "negative mental status exam" also
> showed that Plaintiff "still hears voices," [and]
> "suffers from schizoaffective disorder, bipolar type"
> (Tr. 434-37). The ALJ also failed to explain that the
> medical records show a longitudinal history (since 2016)
> of schizophrenia with audio [sic] hallucinations and
> depressive symptoms including isolating, excessive
> sleeping, and getting easily agitated (Tr. 453-54).
> Notably, the ALJ also failed to explain that Plaintiff

> had her child taken by the [s]tate because of neglectful
> behavior including leaving "her child unattended on the
> balcony as well as in the bathtub." (Tr. 256-58, 422).

(Docket Entry 16 at 7.) Contrary to those allegations, the ALJ's decision reveals that he discussed both the favorable and unfavorable aspects of Plaintiff's mental health treatment and did not mischaracterize the record.

At the outset, the Court notes that Plaintiff has chosen to highlight isolated excerpts of the ALJ's RFC analysis while ignoring his more pertinent evaluation of the "intensity, persistence, and limiting effects of [Plaintiff's] symptoms" (Tr. 29), thus engaging in the very "cherry-picking" of which she accuses the ALJ. The excerpts Plaintiff highlights appear in a paragraph in which the ALJ discussed Plaintiff's psychiatric treatment in 2021 at Advantage Behavioral Healthcare, which paragraph states, in its totality, as follows:

> A mental health note on February 24, 2021, showed
> [Plaintiff] reportedly was non-compliant in the past, but
> was now taking medication that was helping ([Tr. 437]).
> She presented on June 29, 2021, and was stable on
> medications, but she reported she still heard voices.
> She was diagnosed with schizoaffective disorder, bipolar
> type. Her mental status exam showed good eye contact,
> clear and relevant speech without over sign of psychosis
> except some auditory hallucinations, and her cognitive
> functions were grossly intact ([Tr. 436]). By August 20,
> 2021, she reported she was doing better since her Abilify
> dose had been increased. She again had a benign mental
> status exam ([Tr. 435]). The October 14, 2021, notes
> revealed improved auditory hallucinations that were more
> distant and did not preoccupy her as much as they did
> previously. She complained of some anxiety. She denied

14

medication side effects and had a negative mental status
        exam ([Tr. 434]).

(Tr. 29 (emphasis added).)

        As the above-emphasized language makes clear, and contrary to
Plaintiff's contentions (see Docket Entry 16 at 7), the ALJ
expressly acknowledged that Plaintiff "was diagnosed with
schizoaffective disorder, bipolar type," and that she continued to
report auditory hallucinations (with some improvement over time) at
all three mental health visits in question (Tr. 29 (emphasis
added)). Similarly, in contrast to Plaintiff's assertions
(see Docket Entry 16 at 7), the ALJ elsewhere in his decision
explicitly recognized 1) Plaintiff's testimony that "custody [of
her child] was taken away when [Plaintiff] left her child on the
balcony unaccompanied" (Tr. 27 (emphasis added) (referencing Tr.
54)), 2) that, at a psychological assessment, Plaintiff reported a
tendency "to sleep . . . a lot" and that "she did not have any
close friends" (Tr. 28 (emphasis added) (referencing Tr. 373)), and
3) that, at "an initial mental health evaluation" in September
2020, Plaintiff "endorsed auditory and visual hallucinations for
about 5 years," but "had never sought mental health treatment
before" (Tr. 28 (emphasis added) (referencing Tr. 246)).

        Another district court within the Fourth Circuit recently
distinguished Shelley C., because the ALJ there (like the ALJ here
and unlike the ALJ in Shelley C.) had not cherry-picked the mental

                                    15

health evidence and had properly concluded that the plaintiff's mental symptoms improved over time with treatment:

> This case is [] distinguishable from *Shelley C.*, where the ALJ improperly ignored the waxing and waning nature of depression by citing only to treatment notes where the claimant was stable and by omitting evidence of the claimant's subsequent periods of intense depression symptoms. Here, the ALJ noted that treatment notes indicate [the p]laintiff's condition improved over time. [The p]laintiff argues that because she endorsed symptoms of depression during treatment and because she sometimes needed adjustments to her medications, the ALJ erred in finding her not credible. But the ALJ is permitted to find that a claimant's symptoms do not render her totally disabled despite the fact that her symptoms exist and are limiting to a certain extent.

Lasharne W. v. Commissioner, Soc. Sec. Admin., No. CV 21-2603, 2023 WL 2414497, at *4 (D. Md. Mar. 8, 2023) (unpublished) (internal quotation marks and citations omitted).

Put simply, Plaintiff has made no showing that the ALJ violated Shelley C. by cherry-picking the evidence.

ii. Reliance on Absence of Objective Medical Evidence

Plaintiff's contention that the ALJ violated Shelley C. by "relying upon the absence of objective medical evidence to discredit Plaintiff's subjective complaints regarding symptoms of her schizophrenia and chronic depression" (Docket Entry 16 at 7-8) fares no better. The ALJ here found, at steps two and three of the SEP, that Plaintiff suffered from "severe . . . schizoaffective disorder bipolar type, . . . BIF and somatic symptom disorder" (Tr. 21) that did not meet or medically equal any of the Commissioner's listings (see Tr. 22-25), and then, as part of the RFC assessment,

expressly acknowledged Plaintiff's testimony "that she was stressed, heard voices, and was scared and uncomfortable," that "she heard voices every day, [she] had constant stress, and the voices expressed concern about her and scared her," and that "she went to the hospital to get help after her medications ran out and she was admitted" (Tr. 27). The ALJ, however, found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the <u>medical evidence and other evidence in the record</u> for the reasons explained in th[e ALJ's] decision." (Tr. 29 (emphasis added).) The ALJ then supported that latter finding with the following analysis:

> As for [Plaintiff]'s statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because the <u>longitudinal record</u> does not support [Plaintiff] is as limited as she maintains. . . . She <u>did not seek mental health treatment until after her child was taken from her</u> by the Department of Social Services in August 202[0] and they recommended mental health treatment. In a report from a comprehensive psychological assessment . . ., she was <u>assessed with BIF and somatic symptom disorder</u>. However, her <u>mental status exam was relatively benign.</u> Moreover, the summary report in March 2021 showed she had taken Abilify for the previous month and she noted <u>she no longer heard voices</u>. The longitudinal records demonstrated that, <u>when she consistently took her medication, her symptoms were more manageable</u>. . . . Finally, while she was recently hospitalized after she ran out of her medication, this is the <u>only time that she decompensated so that hospitalization was required</u>.

(Tr. 29-30 (internal parenthetical citations omitted).) That analysis by the ALJ did not violate <u>Shelley C.</u> for two reasons.

First, Plaintiff's mental health providers diagnosed her, at differing points during the relevant period in this case, with "schizoaffective disorder, bipolar type" (Tr. 259 (9/9/20)), "somatic symptom disorder" and "[BIF]" (Tr. 382 (3/29/21)), and "schizophrenia, unspecified" (Tr. 455 (2/5/22)). Significantly, none of those providers diagnosed Plaintiff with MDD or any other depressive disorder (see Tr. 259, 382, 455), and, their notes reflect that Plaintiff did not report significant depressive symptoms (see Tr. 247 (indicating that "[Patient Health Questionnaire - 9 ('PHQ-9')] did not indicate significant symptoms associated to depression[] at time of assessment")),[8] 372 (reflecting Plaintiff's report "that she [wa]s feeling [] pretty good currently" and "deni[al of] any history of depression"), 453 (documenting Plaintiff's complaints of "hearing voices" while off her Abilify, and "feeling unsafe and nervous")).

The absence of a depressive disorder distinguishes this case from Shelley C., a case which involved the following facts:

---

[8] "The [PHQ]-9 is a self-administered scale that helps clinicians assess for depression. *Patient Health Questionnaire (PHQ-9 & PHQ-2)*, AM. PSYCHOL. ASS'N, https://www.apa.org/pi/about/publications/caregivers/practice-settings/ assessment/tools/patient-health (last visited Feb. 6, 2020). The nine items on the scale incorporate depression criteria from the [Diagnostic and Statistical Manual of Mental Disorders (Am. Psychiatric Ass'n 4th ed. 1994) ('DSM-IV')]. *Id."* Xavier S. v. Saul, No. 1:19CV1195, 2020 WL 1015816, at *16 (E.D. Va. Mar. 2, 2020) (unpublished). The PHQ-9 "scores each of the nine [DSM-IV] criteria as '0' (not at all) to '3' (nearly every day). The total of the nine scores is used to rate the severity of depression. A total score of 0-4 is 'none,' 5-9 is 'mild,' 10-14 is 'moderate,' 15-19 is 'moderately severe,' and 20-27 is 'severe.' http://patient.info/doctor/patient-health-questionnaire-phq-9." Deboard v. Colvin, No. 3:16CV2661, 2017 WL 510743, at *3 (S.D.W. Va. Jan. 18, 2017) (unpublished), recommendation adopted sub nom. Deboard v. Berryhill, 2017 WL 510052 (S.D.W. Va. Feb. 7, 2017) (unpublished).

- the plaintiff's "long-time treating psychiatrist . . . diagnosed [the plaintiff] with [MDD], dysthymia, and [attention deficit hyperactivity disorder ('ADHD')]," Shelley C., 61 F.4th at 347 (emphasis added);

- the plaintiff attempted suicide by "intentionally overdosing on . . . medications" shortly before applying for DIB, id.;

- the plaintiff's "periods of improvement were short-lived," and she "usually spiraled into deepened periods of heightened anxiety and depression mere days after she vocalized her improvement," id. at 348;

- "[b]ecause [the plaintiff's] symptoms continued to waver despite her therapy and constant medication adjustment, [her treating psychiatrist] urged [the plaintiff] to pursue either Electro Convulsive/Shock Therapy ('ECT') or Transcranial Magnetic Stimulation ('TMS') therapy," id. at 349;[9] and

- the plaintiff underwent "36 TMS treatments" but her "positive results were fleeting, and [she] quickly slipped back into a depressive state, plagued with melancholy, lethargy, and self-deprecating thoughts just weeks after finishing her final TMS session," id. at 350.

The Fourth Circuit emphasized that portions of the ALJ's decision "provided a prime example of the misconceptions surrounding

---

[9] "TMS is a noninvasive procedure that 'uses magnetic fields to stimulate nerve cells in the brain to improve symptoms of depression[.] It is typically used when other depression treatments haven't been effective.'" Shelley C., 61 F.4th at 349 n.3 (internal brackets and ellipsis omitted) (quoting *Mayo Clinic, Transcranial magnetic stimulation* (Nov. 27, 2018), https://www.mayoclinic.org/tests-procedures/transcranial-magnetic-stimulation/about/pac-20384625). "ECT is given to patients with severe, treatment-resistant depression and is performed under general anesthesia, with 'small electric currents passed through the brain, intentionally triggering a brief seizure. ECT seems to cause changes in brain chemistry that can quickly reverse symptoms of certain mental health conditions.'" Id. (internal ellipsis omitted) (quoting *Mayo Clinic, Electroconvulsive therapy (ECT)* (Oct. 12, 2018), https://www.mayoclinic.org/tests-procedures/electroconvulsive-therapy/about/pac-20393894).

19

depression," id. at 367 (emphasis added), noting that individuals with depression can "experienc[e] brief periods of diminished depression, which can appear - from the outside looking in - as overall improvement," id., and that "[t]he ALJ focused on [the plaintiff]'s 'improved' periods to reject the lower, more frequent states of her depression," id. (emphasis added). The Fourth Circuit announced that it would "join [its] sister circuits' growing conversation surrounding chronic diseases, highlighting, in particular, the unique and subjective nature of chronic depression," id. at 368 (emphasis added), found that the plaintiff's MDD met the criteria of Listing 12.04, see id., and "remand[ed] with instructions to grant disability benefits," id. at 369.

Notably, the Fourth Circuit has not extended its holdings in Arakas and Shelley C. to mental impairments other than MDD/chronic depression. Given the Fourth Circuit's repeated emphasis on the "unique" nature of chronic depression, see id. at 368, and the significant difference between the primary symptoms of schizophrenia, see Diagnostic and Statistical Manual of Mental Disorders, 99 (Am. Psychiatric Ass'n 5th ed. 2013) ("DSM-V") (describing "[d]elusions" and "[h]allucinations" as primary symptoms), and the primary symptoms of MDD, see DSM-V, 160 (listing "[d]epressed mood most of the day, nearly every day" and "[m]arkedly diminished interest or pleasure in all, or almost all,

20

activities most of the day, nearly every day" as primary symptoms), the Court finds <u>Shelley C.</u> distinguishable from the instant case.

Second, the ALJ here did not rely "entirely" on the absence of objective medical evidence, <u>Shelley C.</u>, 61 F.4th at 360 (emphasis omitted), or "requir[e]" that objective medical evidence substantiate Plaintiff's mental symptoms, <u>id.</u> at 362. Rather, the ALJ found that Plaintiff's subjective statements about her symptoms lacked consistency with "the <u>medical evidence and other evidence</u> in the record," as well as that "the <u>longitudinal record</u> d[id] not support [Plaintiff wa]s as limited as she maintain[ed]." (Tr. 29 (emphasis added).) Neither of those statements indicate the ALJ relied "entirely" on objective medical evidence, as "medical evidence," "other evidence," and the "longitudinal record" encompass more than just objective medical evidence. Consistent with those findings, although the ALJ mentioned Plaintiff's "relatively benign" mental status examination during the comprehensive psychological assessment (Tr. 29),[10] the ALJ additionally considered the facts that 1) Plaintiff did not seek mental health treatment until she lost custody of her daughter,

---

[10] Notably, during that mental status examination, the psychiatrist described Plaintiff's <u>self-report</u> of her mood as "euthymic" (Tr. 374), and Plaintiff denied "hear[ing] voices at th[at] time" (Tr. 372). <u>Shelley C.</u> does not bar the ALJ from considering those <u>subjective</u> components of a mental status examination. <u>See, e.g.</u>, <u>Shelby D. v. Kijakazi</u>, No. 3:22CV234, 2023 WL 6444895, at *11 (S.D.W. Va. Sept. 29, 2023) (unpublished) (finding ALJ "properly noted that [the plaintiff]'s own *subjective* presentation in mental-status examinations was unremarkable" (emphasis in original).

21

despite alleging that she had experienced psychotic symptoms for five years (see Tr. 28-29), 2) the comprehensive psychological assessment resulted in diagnoses of BIF and somatic symptoms disorder (but not a mood or psychotic disorder), 3) Plaintiff informed her providers that her symptoms improved on Abilify, and 4) her symptoms had required hospitalization only on one occasion during a period of non-compliance with her medication (see Tr. 30).

Shelley C. does not preclude the ALJ from such considerations. As well-explained by another district court in this Circuit:

> Here, the ALJ found [the p]laintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms but concluded that [the p]laintiff's statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record. The ALJ here did not base his conclusion on a lack of objective medical evidence. Rather, the ALJ explicitly noted that his step-two conclusion was based on inconsistencies with the medical evidence and other evidence in the record. The ALJ properly weighed [the p]laintiff's subjective complaints against other evidence in the record. For instance, the ALJ compared [the p]laintiff's hearing testimony to her previous statements, including those made during medical visits with her primary care provider and her statements regarding her activities of daily living, including her ability to care for dependent grandchildren and live alone. Such weighing remains permissible under *Shelley C.* and *Arakas*.

Lasharne W., 2023 WL 2414497, at *4 (internal quotation marks and citations omitted); see also Shelby D. v. Kijakazi, No. 3:22CV234, 2023 WL 6444895, at *11 (S.D.W. Va. Sept. 29, 2023) (unpublished) ("[A] diagnosis of . . . depression does not render a claimant per se disabled. . . . The ALJ expressly stated that his conclusions

were not based exclusively on objective medical findings, but included consideration of the total medical and nonmedical evidence, including testimony and statements by [the plaintiff] and others, a function report, and other record evidence regarding [the plaintiff]'s activities of daily living, behavior and habits. The ALJ supported this assertion by pointing to extensive record evidence of inconsistencies with [the plaintiff]'s allegations regarding the limiting effects of these impairments." (internal quotation marks and parenthetical citation omitted)).

In sum, Plaintiff's contentions do not establish that the ALJ impermissibly required that objective medical evidence substantiate Plaintiff's mental symptoms in violation of Shelley C.

b. Third-Party Function Report

Next, Plaintiff argues that "[t]he ALJ erred by ignoring the function report completed by [] Plaintiff's mother, in violation of 20 C.F.R. § 416.929 and Fourth Circuit precedent." (Docket Entry 16 at 8 (bold font and block formatting omitted).) In particular, Plaintiff maintains that, "despite [her mother]'s informative, probative, and in-depth explanations [on the function report], the ALJ completely ignored [those] responses and rejected the third party function report." (Id. (referencing Tr. 30, 198-206).) Plaintiff specifically faults the ALJ for discounting Plaintiff's mother's report as "'merely observations'" (id. at 9 (quoting Tr. 30)), because "the whole purpose of the Stage [sic] agency Third

23

Party Function Report is to obtain explanations and observations from a person that frequently sees or lives with the claimant" (id. (citing Program Operations Manual System ("POMS") DI 20502.015.J. ("[Form] SSA-3380 (Function Report - Adult Third Party)"))).[11] Additionally, Plaintiff contends that "the ALJ fail[ed] to explain which of the answers given by Plaintiff's mother . . . undermine [] Plaintiff's significant nonexertional limitations" (id. at 10 (referencing Tr. 30)), and asserts that Plaintiff's mother's statements "are actually supported and corroborated by Plaintiff's testimony and are consistent with the medical and nonmedical evidence of record" (id. (citing Lester v. Kijakazi, No. 1:21CV36, 2023 WL 2591477, at *3 (W.D. Va. Mar. 21, 2023) (unpublished))).

Plaintiff's mother constitutes a "[n]onmedical source" under the regulations. 20 C.F.R. § 416.902(j)(4) (listing "[f]amily members" as nonmedical sources). Under amended regulations (applicable to claims like Plaintiff's filed on or after March 27, 2017 (see Tr. 168)), ALJs "are not required to articulate how [they] considered evidence from nonmedical sources using the requirements in paragraphs (a) through (c) of [20 C.F.R. § 416.920c,]" 20 C.F.R. § 416.920c(d) (emphasis added). In turn,

_____

[11] "POMS is a non-binding internal guidebook used by the SSA," which "has no legal force," although "courts consider it persuasive" authority. Jackson v. Colvin, No. 13CV5254, 2016 WL 3087056, at *2 (N.D. Ill. May 31, 2016) (unpublished); see also Carillo-Yeras v. Astrue, 671 F.3d 731, 735 (9th Cir. 2011) ("POMS may be entitled to some deference to the extent it provides a persuasive interpretation of an ambiguous regulation, but it does not impose judicially enforceable duties on either th[e] court or the ALJ." (internal quotation marks omitted).

paragraphs (a) through (c) set forth the factors, including consistency and supportability, that an ALJ must consider when evaluating the persuasiveness of opinions from <u>medical</u> sources, <u>see</u> 20 C.F.R. § 416.920c(a)-(c).[12]

Although the regulations clearly did not require the ALJ to apply the medical opinion factors to Plaintiff's mother's third party function report, the law remains unsettled whether ALJs must provide <u>any</u> articulation of their consideration of nonmedical evidence. <u>See</u> <u>Ellen S. v. Kijakazi</u>, No. 5:20CV1940, 2022 WL 221225, at *7 (C.D. Cal. Jan. 24, 2022) (unpublished) ("The question of how the 2017 rule change impacts the ALJ's obligations with respect to addressing lay witness testimony is unanswered in the current caselaw."). Plaintiff did not address Section 416.920c(d) in his arguments (<u>see</u> Docket Entries 16, 19), and the Commissioner takes the position that "[t]he regulations <u>have no specific articulation requirement</u> regarding how an ALJ should

_____

[12] Applicable to claims (like Plaintiff's (<u>see</u> Tr. 168)) filed on or after March 27, 2017, the SSA rescinded Social Security Ruling 06-03p, <u>Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies</u>, 2006 WL 2329939 (Aug. 9, 2006) ("SSR 06-03p"), <u>see</u> "Rescission of Social Security Rulings 96-2p, 96-5p, and 06-03p," 82 Fed. Reg. 15263-01 (March 27, 2017). SSR 06-03p provided that "information from [non-medical sources] may be based on special knowledge of the [claimant] and may provide insight into the severity of the impairment(s) and how it affects the claimant's ability to function," SSR 06-03p, 2006 WL 2329939, at *2, and advised that, in considering evidence from these sources, "it would be appropriate [for the ALJ] to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence," <u>id.</u> at *6.

25

discuss evidence from 'nonmedical sources[]'" (Docket Entry 18 at 11 (emphasis added)).

Although courts across the country disagree over Section 416.920c(d)'s articulation standard, the majority of cases to address the issue have held that Section 416.920c(d) (or its counterpart for Disability Insurance Benefit cases, Section 404.1520c(d)) did not remove the articulation requirement altogether and continues to obligate ALJs to provide some explanation of how they considered nonmedical evidence. Compare Demian W. v. Commissioner of Soc. Sec., No. 3:22CV660, 2023 WL 6147528, at *10 (S.D. Ill. Sept. 20, 2023) (unpublished) (determining that, when considering third-party statements from nonmedical sources under Section 416.920c(d), an ALJ must still "build a logical bridge between the evidence and conclusions" and "articulate some legitimate reason for his decision"), Cousino v. Commissioner of Soc. Sec., No. 3:22CV1712, 2023 WL 3629809, at *12 (N.D. Ohio May 4, 2023) (unpublished) (observing that Section 416.920c(d) "does not mean, as the Commissioner implie[d], that the ALJ was free to discount [evidence from a nonmedical source] without comment," and noting that "[t]he regulations are quite clear on the types of evidence an ALJ is allowed to disregard: (i) decisions by governmental agencies and nongovernmental entities; (ii) disability examiner findings; and (iii) statements on issues reserved for the Commissioner," as well as that "[l]ay witness

26

testimony is not among th[os]e three categories" (citing 20 C.F.R. § 404.1520b(c)), recommendation adopted, 2023 WL 3620793 (N.D. Ohio May 24, 2023) (unpublished), Norman P. v. Kijakazi, No. 1:21CV2542, 2022 WL 3908126, at *4 (S.D. Ind. Aug. 31, 2022) (unpublished) ("According to the Commissioner and the ALJ, the regulations do not impose any burden of articulation on ALJs for evidence from nonmedical sources. Not so. In evaluating a plaintiff's allegations of pain and the intensity and persistence of symptoms, the ALJ is to consider all evidence presented, including statements of nonmedical sources. 20 C.F.R. § 404.1529. Under 20 C.F.R. § 404.1520c(d), an ALJ need not articulate 'how he considered evidence from nonmedical sources *using the requirements* in paragraphs (a)-(c) of this subsection." Paragraph (d) merely clarifies that an ALJ is not required to apply those *factors* to a nonmedical opinion; it does not state that an ALJ need not articulate how evidence from nonmedical sources was considered *at all*." (emphasis in original)), Shingler v. Kijakazi, No. 4:20CV1344, 2022 WL 273426, at *6 (M.D. Pa. Jan. 28, 2022) (unpublished) ("Other courts have held, and [the court] agree[s], that 20 C.F.R. § 416.920c(d) does not eliminate the articulation requirement altogether."), Andrew L. v. Kijakazi, No. 20CV1609, 2021 WL 5447035, at *4 (N.D. Ill. Nov. 22, 2021) (unpublished) (deciding that Section 416.920c(d) "requires at least minimal articulation of how nonmedical evidence was considered . . . to

27

allow the court to meaningfully assess whether the ALJ applied the correct legal standards and supported h[is] decision with substantial evidence"), Tanya L. L. v. Commissioner of Soc. Sec., 526 F. Supp. 3d 858, 869-70 (D. Or. 2021) (holding that regulations "do not eliminate the need for the ALJ to articulate his assessment of the lay-witness statements" and "his reasons for discounting such statements"), and Jerri F. v. Kijakazi, 1:20CV4037, 2021 WL 3362227, at *14 (D.S.C. July 29, 2021) (unpublished) ("If ALJs were no longer required to provide any articulation as to how they considered lay witness statements, the additional language ['using the requirements in paragraphs (a)-(c)' of Section 404.1520c] would be superfluous."), recommendation adopted, 2021 WL 3396230 (D.S.C. Aug. 3, 2021) (unpublished), with Mary M. v. Kijakazi, No. 20CV1457, 2022 WL 891445, at *6 (S.D. Cal. Mar. 25, 2022) (unpublished) ("The [c]ourt concludes that ALJs are not required to articulate specific reasons for their findings about the persuasiveness of nonmedical-source testimony, and instead must merely show that they considered such evidence in deciding the claim."), Pamela M. v. Kijakazi, No. 20CV5479, 2021 WL 4461546, at *11 (N.D. Cal. Sept. 29, 2021) (unpublished) (noting that ALJs are "not required to articulate how [they] considered evidence from nonmedical sources" (internal quotation marks omitted)), and Cole v. Kijakazi, No. 2:20CV733, 2021 WL 3887463, at *11 (N.D. Ala. Aug. 31, 2021) (unpublished) ("Under the new regulations, an ALJ does

28

not have to explain how she weighed or considered nonmedical evidence.").

The majority position, that ALJs adjudicating claims filed on or after March 27, 2017, should provide some degree of articulation when evaluating evidence from nonmedical sources, harmonizes with the SSA's internal policy, which provides that ALJs should not "include the consideration of evidence from nonmedical sources in the analysis about establishing a[ medically determinable impairment]," but that, "[w]hen evidence from nonmedical sources is material to other analyses or conclusions in a claim, [the ALJ should] articulate that in the determination." POMS DI 24503.020.D.1 ("Evaluating Evidence from Nonmedical Sources") (emphasis added). That POMS section, in turn, remains consistent with long-standing Fourth Circuit precedent which holds that "a denial of benefits is not supported by substantial evidence if the ALJ has not analyzed all evidence and sufficiently explained the weight he has given to obviously probative exhibits." Craig, 76 F.3d at 590 (emphasis added) (internal quotation marks, brackets, and ellipsis omitted); see also Cooper v. Astrue, No. 2:08CV18, 2009 WL 928548, at *5–6 (E.D.N.C. Apr. 3, 2009) (unpublished) ("If the ALJ decides to reject lay testimony concerning a [c]laimant's . . . symptoms, the ALJ must do so explicitly and with sufficient specificity to enable the court to decide whether there

are legitimate reasons for the ALJ's disbelief and whether the ALJ's determination is supported by substantial evidence.").

On April 2, 2021, Plaintiff's mother completed a third party function report (Tr. 198-206), stating that Plaintiff lived alone in an apartment, but that her mother "spen[t] several hours a day with [Plaintiff] checking her." (Tr. 198.) Plaintiff's mother further reported that Plaintiff "t[ook] care of her daughter," but described Plaintiff as "very restless" and noted that she did not "sleep well and sometimes sle[pt] too much." (Tr. 199.) Plaintiff's mother also indicated that Plaintiff had no problems with personal care (see Tr. 199), but noted that "it t[ook] her longer to do [personal care activities]" (Tr. 200), as well as that Plaintiff needed reminders "to take her medicine" and to complete household chores (id.). According to Plaintiff's mother, Plaintiff "c[ould] cook her o[w]n meals . . . [w]hen she fe[lt] well enough to cook," which occurred "maybe 2 times a week" (id.), "hardly ever" went outside (Tr. 201), and could drive, shop in grocery stores, and handle money with reminders, but Plaintiff's mother "prefer[ed]" to drive Plaintiff places due to her lack of focus (id.). Additionally, Plaintiff's mother stated that Plaintiff "d[id]n't spend time with others" (Tr. 202), "g[ot] agitated easily" although she "d[id]n't have a problem getting along with people" (Tr. 203), "c[ould] follow instruction[s] but her processing t[ook] longer" (id.), and could not handle stress or

30

changes in routine "at all" (Tr. 204). Under the section for additional remarks, Plaintiff's mother provided the following statements:

> [Plaintiff] can[']t process what [sic] information as quickly as she would like to[. S]he can comprehend everything being said to her but processing information and reacting to it is a slower process. While she is able to do things on her o[w]n[,] sometimes her memory requires a reminder from others to what needs to [sic] done. [H]er processing is slower[. I]t somewhat reminds me of someone that may have had a nervous breakdown and just doesn't process things as fast, memory, things like that. Halucinations [sic] have occured [sic] but [she] is taken [sic] Abilify[. H]earing voices have ocurred [sic] periodicly [sic] not on a [sic] everyday basis[.] Her mental capacity is just diffrent [sic] hearing voices, memory, [a]ttention span, her whole mental function has just changed[.]

(Tr. 205-06.) Those detailed remarks from a family member who had known Plaintiff for "26 years" and spent "several hours" per day with Plaintiff (Tr. 198) qualify as material and probative regarding the impact of Plaintiff's mental symptoms on her ability to function and, therefore, the ALJ had a duty to articulate how he considered Plaintiff's mother's function report in a way that permitted meaningful judicial review.

The ALJ provided the following analysis of Plaintiff's mother's third party function report:

> . . . [Plaintiff]'s mother[] reported that she spent several hours a day checking on [Plaintiff]. [Plaintiff's mother] noted that [Plaintiff] lived alone, took care of her daughter, and she was very restless, not sleeping well and sometimes sleeping too much. [Plaintiff's mother] reported [Plaintiff] could perform personal grooming tasks, but it took longer. She had to be reminded to take her medication and she

31

prepared simple meals when she felt well enough. [The ALJ] find[s] the statement of [Plaintiff's mother] has <u>little persuasiveness</u>. According to [SSA] regulations, I must consider all evidence, <u>even evidence that is inherently neither valuable nor persuasive</u>. The observations of [Plaintiff's mother] and her report of [Plaintiff]'s daily activities are <u>merely observations</u> and, if anything, they <u>undermine [Plaintiff]'s assertion that she is disabled</u>.

(Tr. 30 (internal parenthetical citation omitted) (emphasis added).) Although that analysis clearly dispels Plaintiff's assertion that "the ALJ completely ignored" Plaintiff's mother's function report (Docket Entry 16 at 9), for the reasons that follow, the ALJ's analysis does not sufficiently explain the basis for affording the report "little persuasiveness" (Tr. 30).

To begin, the ALJ's reference to "evidence that is inherently neither valuable nor persuasive" does not make sense in the context of evaluating evidence from a nonmedical source. "The regulations are quite clear on the types of evidence an ALJ is allowed to disregard [as 'evidence that is inherently neither valuable nor persuasive']: (i) decisions by governmental agencies and nongovernmental entities; (ii) [state agency] disability examiner findings [at a previous level of review]; and (iii) statements on issues reserved for the Commissioner," and "[l]ay witness testimony is not among th[os]e three categories." <u>Cousino</u>, 2023 WL 3629809, at *12 (citing 20 C.F.R. § 404.1520b(c)). To the extent the ALJ approached his analysis of Plaintiff's mother's function report

32

under the belief that the regulations deemed that evidence "inherently neither valuable nor persuasive" (Tr. 30), he erred.

Beyond that error, the ALJ's circular remark that Plaintiff's mother's "observations . . . [we]re merely observations" (Tr. 30) fails to provide a sufficient basis to discount Plaintiff's mother's function report. The ALJ's criticism would apply to virtually any third party function report, as the report form tasks the individuals completing such reports to provide their observations about a claimant's ability to engage in various activities. See Marshall v. Colvin, No. 1:14CV542, 2015 WL 5970435, at *9 (M.D.N.C. Oct. 14, 2015) (unpublished) ("[The p]laintiff's point that the bases cited by the ALJ [for assigning little weight to a third party function report completed by the plaintiff's girlfriend, including that she was not a medical doctor and had a natural bias in favor of the plaintiff] could discredit virtually any family member, friend, housemate or acquaintance who testified or gave a statement in any case has some merit. Ideally, the ALJ would provide more complete, evidence-based reasons for rejecting a third party's report." (internal quotation marks and parenthetical citation omitted)), recommendation adopted, 2016 WL 5660295 (M.D.N.C. Sept. 30, 2016) (unpublished) (Tilley, S.J.). Further, the ALJ's statement that Plaintiff's mother's observations "undermine[d Plaintiff]'s assertion that she is disabled" does not suffice to explain the "little persuasiveness" finding (Tr. 30),

33

because the ALJ explained neither <u>how</u> those observations undermined Plaintiff's position nor <u>which</u> observations undermined Plaintiff's position (<u>see</u> <u>id.</u>).

Notwithstanding the ALJ's failure to provide a sufficient explanation of his decision to assign little persuasiveness to Plaintiff's mother's function report, the Court concludes that the ALJ's error in that regard remains harmless under the circumstances of this case. <u>See generally</u> <u>Fisher v. Bowen</u>, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). Plaintiff has not explained how remanding this matter for the ALJ to further consider Plaintiff's mother's function report would lead to a favorable outcome in her case. (<u>See</u> Docket Entries 16, 19.) That failure precludes relief. <u>See</u> <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks omitted)); <u>Hughes v. B/E Aerospace, Inc.</u>, No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (unpublished) (Schroeder, J.) ("A party should not expect a court to do the work that it elected not to do.").

Moreover, the ALJ's step three findings and RFC "amply accommodate[d] Plaintiff's mother's statements" on the function

34

report, <u>Long v. Colvin</u>, No. 1:13CV659, 2015 WL 1312919, at *10 (M.D.N.C. Mar. 24, 2015) (unpublished), <u>recommendation adopted</u>, 2015 WL 1646985 (M.D.N.C. Apr. 14, 2015) (unpublished) (Osteen, Jr., C.J.). Based in part on Plaintiff's mother's statements "that she spent several hours each day checking on [Plaintiff]," and that "[Plaintiff] required reminders to take her medication and her processing memory and overall mental function was different" (Tr. 23), the ALJ found Plaintiff moderately limited in her ability to understand, remember, or apply information at step three of the SEP (see <u>id.</u>), and included a corresponding limitation in the RFC to "simple, routine tasks" (Tr. 26). Relying in part on Plaintiff's mother's statements that "[Plaintiff] hardly ever went outside and was 'to herself,'" as well as that "[Plaintiff] shopped in stores for food every two weeks, but it took a 'very long time'" (Tr. 24 (quoting Tr. 201)), the ALJ found Plaintiff moderately limited in her ability to interact with others (see Tr. 23-24), and included RFC restrictions to "a [] job primarily dealing with things as opposed to people" (Tr. 26), "no more than occasional interaction with the public, supervisors, and co-workers" (<u>id.</u>), and "no work with the public as a component of the job" (Tr. 26-27). Although the ALJ did not rely on the statements of Plaintiff's mother to find Plaintiff moderately limited in CPP (see Tr. 24), the ALJ's RFC finding that Plaintiff remained able to "maintain attention, concentration, persistence, or pace to stay on task for 2-hour

35

periods during a normal 8-hour workday, as required to perform s[imple, routine] tasks" and restriction to "work that is not production pace or quota based" adequately addressed Plaintiff's mother's statements that Plaintiff could not "maintain [her] attention span <u>for long</u>" or "focus <u>at times</u>" and did "not pay[] attention or observ[e] what[ was] going on <u>to the full ext[ent]</u>" (Tr. 201 (emphasis added)). Lastly, founded in part on Plaintiff's mother's remarks that "[Plaintiff] was able to do tasks, but it took longer to do them," she "prepared simple meals when she was taking medications," "[Plaintiff's mother] preferred to drive [Plaintiff] where she needed to go" because of "her inability to focus," she "required reminders to take her medication[,] and [she] had sleep issues, sometimes sleeping too much" (Tr. 24), the ALJ found Plaintiff moderately limited in her ability to adapt or manage herself (<u>see</u> Tr. 24), and included limitations to "simple, routine tasks" and "a low stress work setting" entailing non-production work, no more than occasional interaction with others, and only incidental contact with the public (Tr. 26-27).

Accordingly, "the ALJ's failure to [provide a sufficient explanation for discounting] the third party function report submitted by Plaintiff's mother constitute[d] at most harmless error, because that report d[id] not materially contradict the ALJ's RFC determination." <u>Long</u>, 2015 WL 1312919, at *10.

36

c.    CPP

In Plaintiff's third sub-claim regarding her RFC, she asserts
that "[t]he ALJ erred by failing to adequately account for []
Plaintiff's limitations in maintaining [CPP] in the RFC assessment,
in violation of Fourth Circuit precedent."  (Docket Entry 16 at 11
(bold font and block formatting omitted).)   More specifically,
Plaintiff notes that the Fourth Circuit has held that "'an ALJ does
not account for a claimant's moderate limitations in [CPP] by
restricting the hypothetical RFC [sic] question to simple, routine
tasks or unskilled work.'"   (Id. at 12 (internal quotation marks
and italics omitted) (quoting Mascio v. Colvin, 780 F.3d 632, 638
(4th Cir. 2015)).)   In Plaintiff's view, despite finding Plaintiff
moderately limited in CPP (id. (citing Tr. 24)), "the ALJ
formulated a legally insufficient RFC by failing to adequately
account for or explain how Plaintiff's moderate limitations in
[CPP] were included in the RFC" (id. (referencing Tr. 26-27)).
Plaintiff's Mascio-based argument misses the mark.

The Fourth Circuit has held that "the ability to perform
simple tasks differs from the ability to stay on task[,]" and that
"[o]nly the latter limitation would account for a claimant's
limitation in [CPP]."   Mascio, 780 F.3d at 638.   However, as a
neighboring district court has explained:

> Mascio does not broadly dictate that a claimant's
> moderate impairment in [CPP] always translates into a
> limitation in the RFC.   Rather, Mascio underscores the
> ALJ's duty to adequately review the evidence and explain

37

the decision . . . . An ALJ may account for a claimant's limitation with [CPP] by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court.

Jones v. Colvin, No. 7:14CV273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015) (magistrate judge's recommendation adopted by district judge) (unpublished) (emphasis added); see also Hutton v. Colvin, No. 2:14CV63, 2015 WL 3757204, at *3 (N.D.W. Va. June 16, 2015) (unpublished) (finding reliance on Mascio "misplaced," because ALJ "gave abundant explanation" for why the plaintiff could perform unskilled work despite moderate limitation in CPP, by highlighting his daily activities and treating physicians' opinions). Here, the ALJ's decision provides a sufficient explanation as to why restrictions to "simple, routine tasks," "work that is not production pace or quota based, rather a goal-oriented job primarily dealing with things rather than people," "no more than occasional interaction with the public, supervisors, and co-workers," and "no work with the public as a component of the job" (Tr. 26-27), together adequately accounted for Plaintiff's moderate deficit in CPP.

First, the ALJ expressly found in the RFC that, despite moderate limitation in CPP, Plaintiff retained the ability to "maintain attention, concentration, persistence, or pace to stay on task for 2-hour periods during a normal 8-hour workday, as required

38

to perform s[imple, routine] tasks" (Tr. 26 (emphasis added)),
provided that the simple tasks also involved "low stress work,"
"defined as work that is not production pace or quota based, rather
a goal-oriented job primarily dealing with things as opposed to
people[, with] no more than occasional interaction with the public,
supervisors, and co-workers, but no work with the public as a
component of the job" (Tr. 26-27). The ALJ also included that same
finding in his dispositive hypothetical question to the VE. (See
Tr. 58.) Thus, the ALJ directly addressed Plaintiff's ability to
stay on task in the RFC and hypothetical question, which
distinguishes this case from Mascio. See Falls v. Colvin, No.
8:14CV195, 2015 WL 5797751, at *7 (D.S.C. Sept. 29, 2015)
(unpublished) (distinguishing Mascio where ALJ accounted for
moderate CPP limitation by crafting restriction to performance of
"simple, routine, repetitive tasks of one and two step instructions
for . . . two hour periods," while "interact[ing] occasionally with
the public" and working only "at a non-production pace," meaning
"[n]o fast paced type work" and a "stable routine setting").
Furthermore, the ALJ's non-production restriction, in and of
itself, adequately accounted for Plaintiff's moderate limitation in
CPP. See Grant v. Colvin, No. 1:15CV515, 2016 WL 4007606, at *9
(M.D.N.C. July 26, 2016) (unpublished) (finding non-production
restriction "facially addresse[d] moderate . . . limitation in the
claimant's ability to stay on task" (internal quotation marks

omitted)), _recommendation adopted_, slip op. (M.D.N.C. Sept. 21, 2016) (Osteen, Jr., C.J.).

Second, the ALJ acknowledged Plaintiff's testimony that "she did not think she could do a simple job since her mind did not understand how to do things and she could not concentrate" (Tr. 27 (referencing Tr. 55-56)), but the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [] not entirely consistent with the objective medical and other evidence for the reasons discussed in th[e ALJ's] decision" (Tr. 29).  As discussed above, Plaintiff's argument that the ALJ violated _Shelley C._ in his evaluation of Plaintiff's subjective symptom reporting lacks merit, and Plaintiff has not raised any other challenge to that evaluation (_see_ Docket Entries 16, 19).

Third, the ALJ summarized Plaintiff's mental health treatment, making the following, pertinent observations:

- "[t]he record shows [Plaintiff] had <u>no consistent mental health treatment until her child was taken</u> from her by Social Services in September 2020" and, although "she endorsed auditory and visual hallucinations for about 5 years, she had never sought mental health treatment before" (Tr. 28 (emphasis added));

- at a comprehensive psychological evaluation conducted over three sessions from November 2020 to January 2021, Plaintiff reported <u>no "history of significant attention and concentration problems"</u> and "[h]er mental status examination revealed she was alert, oriented to person, place, time and situation, was goal directed[,] . . . presented her thoughts spontaneously, relevantly, and in a well-organized manner[,] . . . had good eye contact[,] and . . . [h]er memory, <u>attention, and</u>

40

concentration appeared grossly intact" (<u>id.</u> (emphasis added)); and

- during the administration of multiple tests during comprehensive psychological evaluation, Plaintiff "was prompt but careful in responding[, ] her activity level was within normal limits[, and s]he was <u>attentive to tasks and generally persisted with difficult[] tasks</u>" and testing "<u>results did not suggest that she had a disorder characterized by attention deficits</u>" (<u>id.</u> (emphasis added)).

All of those observations support the ALJ's finding that, despite moderate limitation in CPP, Plaintiff remained able to "maintain attention, concentration, persistence, or pace to stay on task for 2-hour periods during a normal 8-hour workday, as required to perform s[imple, routine] tasks." (Tr. 26.)

Accordingly, Plaintiff's contentions under <u>Mascio</u> fall short.

d. <u>Opinions of Examining Psychologist</u>

Plaintiff's fourth RFC sub-argument maintains that "[t]he ALJ erred by failing to adequately account for the marked/extreme limitations opined by the examining psychologist, [Dr. R. Monique Miller,] whose opinion the ALJ found persuasive." (Docket Entry 16 at 12 (bold font and block formatting omitted).) In particular, Plaintiff contends that, "based upon the objective intelligence and memory tests" conducted during the comprehensive psychological assessment from November 2020 to January 2021, "Plaintiff obtained a valid Full-Scale IQ score of 73, which ranks in the bottom 5% of the general population," ranked in the bottom 3% of the general population in her ability to maintain attention, ranked in the

41

bottom 0.2% of the general population in her immediate memory abilities," and "'show[ed] considerable weakness in her language abilities, . . . performing in the very low range [of <0.1% of the general population].'" (Id. at 12-13 (italics omitted) (citing and quoting Tr. 379).)  In Plaintiff's view, those test findings amounted to "opin[ions]" from Dr. Miller that Plaintiff "ha[d] *marked* or *extreme limitations* in . . . attention[,] . . . immediate memories[,] . . . language skills[,] . . . and general learning ability." (Id. at 13 (italics in original).) Plaintiff faults the ALJ for "specifically f[inding] Dr. Miller's [] opinion as *persuasive* because it was *supported* by objective testing and *consistent* with the exam and observations" (id. (italics in original) (citing Tr. 30)), but then "fail[ing] to include" those "marked/extreme limitations" in the RFC (id. (referencing Tr. 26-27)).  Plaintiff's arguments fail as a matter of law.

As a threshold matter, Plaintiff mischaracterizes the record by arguing that the ALJ "specifically found Dr. Miller's [] opinion as *persuasive*" (id. (italics in original) (citing Tr. 30)), because the ALJ made no such finding (see Tr. 30).  The ALJ discussed at length the report of the comprehensive psychological evaluation (see Tr. 28), and then provided the following analysis of the report's persuasiveness:

> On March 29, 2021, [Plaintiff] was assessed with BIF and somatic symptom disorder.  [Dr.] Miller . . . opined that

42

[Plaintiff] had a full-scale intelligence quotient of 73 (FSIQ), and she would benefit from individual therapy. Her prescription [of Abilify] was effective so it should continue. She was provided strategies to improve her memory such as composing mental pictures and improving her listening skills by paying attention. [The ALJ] find[s] the opinion of Dr. Miller <u>somewhat persuasive</u> because it is supported by objective testing, mental health is her specialty, and the conclusions are consistent with the exam and observations. However, <u>Dr. Miller did not explain in vocationally relevant terms how [Plaintiff]'s impairments limited her ability to fulfill the basic mental demands of competitive, remunerative, unskilled work</u> so the opinion is <u>only somewhat persuasive</u>. However, [the ALJ] do[es] note that while the FSIQ results confirms [sic] the BIF, the overall report does not detail whether Listing 12.05 is met or medically equaled. <u>The opinions of the [s]tate agency psychological consultant[s] who determined [Plaintiff] had moderate paragraph "B" criteria but could perform simple work is [sic] consistent with the longitudinal record and my finding that [Plaintiff] is not disabled</u>.

(Tr. 30 (emphasis added) (internal parenthetical citations omitted).) That analysis not only undercuts Plaintiff's statement that the ALJ found Dr. Miller's opinions "persuasive" (Docket Entry 16 at 13 (italics omitted)), but, for the reasons discussed below, also defeats Plaintiff's remaining contentions regarding the ALJ's handling of Dr. Miller's report.

Plaintiff zeroes in on her test results from the Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS"), "a brief neuropsychological screener" (Tr. 381), of "borderline" in attention and of "very low" in immediate memory and language to argue that Dr. Miller "opined" that Plaintiff had "marked or extreme limitations" in attention, immediate memory, language, and

43

general learning ability. (Id. (citing Tr. 379).)[13] Plaintiff's arguments gloss over two important facts. First, Dr. Miller expressly noted that Plaintiff's "language and immediate memory abilities were in the very low range" on the RBANS, which "was somewhat inconsistent with the short-term memory tasks on the [Woodcock-Johnson IV Tests of Cognitive Abilities ('WJ-IV')], in which she performed in the low average and average ranges," and "her language abilities . . . tasks [] in the borderline to low average ranges on most verbal areas on the [WJ-IV]." (Tr. 381 (emphasis added).) That noted inconsistency undermines Plaintiff's attempt to transform her test results on a "brief neuropsychological screener" into opinions that she suffered marked to extreme limitations in various mental abilities. Second, Dr. Miller did not, at any place in her comprehensive report, opine that Plaintiff suffered "marked" or "extreme" limitations in any mental ability. (See Tr. 372-83.) As the ALJ recognized, Dr. Miller "did not explain in vocationally relevant terms how [Plaintiff]'s impairments limited her ability to fulfill the basic mental demands of competitive, remunerative, unskilled work" (Tr. 30), but, rather, recommended that Plaintiff pursue individual

_____

[13] Plaintiff did not point the Court to any particular test result that she equated to an opinion from Dr. Miller that Plaintiff had marked or extreme limitations in general learning ability. (See Docket Entry 16 at 13.) Of note, on the Woodcock-Johnson IV Tests of Cognitive Abilities, Plaintiff's scores in broad comprehension and knowledge and fluid reasoning fell in the borderline range (see Tr. 376), which scores cohere with the ALJ's finding at step two of the SEP that Plaintiff's severe impairments included BIF (see Tr. 21).

Case 1:22-cv-00919-LPA   Document 20   Filed 02/05/24   Page 44 of 52

therapy, continue her Abilify, try guided meditation, and utilize strategies to improve her memory (see Tr. 382-83). Moreover, the ALJ expressly found the state agency psychological consultants' <u>moderate</u> limitations in the four areas of mental functioning consistent with the record (see Tr. 30).

In light of the foregoing analysis, Plaintiff's fourth RFC sub-argument does not establish a basis for remand.

e.   Incorrect Regulatory Framework

Plaintiff's final RFC-related argument contends that "[t]he ALJ formulated a legally insufficient RFC assessment, in violation of Social Security law and Fourth Circuit precedent." (Docket Entry 16 at 15 (bold font and block-formatting omitted).)   In particular, Plaintiff asserts that, in violation of Dowling v. Commissioner of Soc. Sec. Admin., 986 F.3d 377, 387 (4th Cir. 2021), "the ALJ's RFC determination was based entirely on SSR 16-3p and 20 C.F.R. § 404.1529, which sets [sic] out the process ALJs use to evaluate the intensity and persistence of a claimant's symptoms and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective and other evidence in the record" and, did not, under the "'**_Findings of Fact and Conclusions of Law_**,' . . . cite to[] the required regulatory framework under 20 C.F.R. § 404.1545 [sic] or [Social Security Ruling 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184 (July 2,

45

1996) ('SSR 96-8p')] or address their requirements." (Id.)
Plaintiff further notes that "'the ALJ's only reference to 20
C.F.R. § 404.1545 and SSR 96-8p appears in the boilerplate
explanation of the disability evaluation process that precedes his
findings of fact and conclusions of law,'" which did not suffice
under Dowling. (Id. at 15-16 (quoting Karen O. v. Kijakazi, Civ.
No. 21-626, 2022 WL 2954783, at *5 (D. Md. July 26, 2022)
(unpublished)); see also id. at 16 (further citing Burton v.
Commissioner, No. 3:22CV104, 2023 WL 2731049, at *5 (W.D.N.C. Mar.
30, 2023) (unpublished), and Elvis P. v. Saul, No. 1:20CV2330, 2021
WL 870475, at *15-17 (D.S.C. Mar. 9, 2021) (unpublished)).) As a
result of the ALJ's use of an incorrect RFC framework, Plaintiff
asserts that "the ALJ erred by failing to engage in the mandatory
function-by-function analysis of Plaintiff's ability to maintain
[CPP] throughout an 8-hour workday *and 5-day workweek*." (Id. at 16
(italics in original).) Those arguments entitle Plaintiff to no
relief.

        As Plaintiff concedes (see id. at 15-16), the ALJ here did
cite to the correct standards governing the assessment of RFC in
the "Applicable Law" section of his decision (Tr. 20 (formatting
omitted)):

        Before considering step four of the [SEP], the [ALJ] must
        first determine [Plaintiff]'s [RFC] (20 CFR 416.920(e)).
        An individual's [RFC] is her ability to do physical and
        mental work activities on a sustained basis despite
        limitations from her impairments. In making this
        finding, the [ALJ] must consider all of [Plaintiff]'s

                                46

> impairments, including impairments that are not severe
> (20 CFR 416.920(e) and 416.945; SSR 96-8p).

(Tr. 21 (emphasis added).)  Furthermore, unlike the court in Karen
O., the Court does not find significant that the ALJ discussed
Section 416.945 and SSR 96-8p in the portion of his decision
entitled "Applicable Law" (Tr. 20 (formatting omitted)), rather
than in the section entitled "Findings of Fact and Conclusions of
Law" (Tr. 21 (formatting omitted)).  Notably, the ALJ's reference
to Section 416.929 and SSR 16-3p that Plaintiff finds problematic
in the "Findings of Fact and Conclusions of Law" section of the
decision also occurs within the ALJ's recitation of so-called
boilerplate (see Tr. 27).  See Rose A. v. O'Malley, No. 3:23CV551,
2024 WL 256972, at *9 (S.D.W. Va. Jan. 5, 2024) (unpublished) ("To
the extent the [p]laintiff asserts that remand is warranted
[because] the ALJ's only referring to Section 404.1545 and SSR
96-8p in boilerplate is comparable to the situation presented in
Dowling, . . . this assertion lacks merit.  The Fourth Circuit did
not hold that remand was required for an [ALJ] mentioning these
regulatory frameworks only once – in that case, the ALJ did not
cite to these regulatory frameworks *at all*, but instead relied upon
the incorrect regulatory framework . . . which pertain[s] to the
evaluation of a claimant's subjective complaints."), recommendation
adopted, 2024 WL 253656 (S.D.W. Va. Jan. 23, 2024) (unpublished);
Pickett v. Kijakazi, No. 1:21CV500, 2022 WL 3908862, at *5
(M.D.N.C. Aug. 30, 2022) (unpublished) (Peake, M.J.)

47

(distinguishing <u>Dowling</u> in part, because "the ALJ d[id] cite to 20 C.F.R. §§ 404.1545, 404.1520, and [SSR] 96-8p in explaining how the RFC is determined"), <u>recommendation adopted</u>, 2022 WL 4585941 (M.D.N.C. Sept. 29, 2022) (unpublished) (Osteen, Jr., J.).

Furthermore, Plaintiff's complaint that "the ALJ erred by failing to engage in the mandatory function-by-function analysis of Plaintiff's ability to maintain [CPP] throughout an 8-hour workday *and 5-day workweek*" (Docket Entry 16 at 16 (italics in original)) misses the mark. As discussed above in the context of Plaintiff's <u>Mascio</u> sub-argument, the ALJ here expressly found in the RFC that Plaintiff remained able to <u>maintain attention, concentration, persistence, or pace to stay on task for 2-hour periods during a normal 8-hour workday, as required to perform s[imple, routine] tasks</u>" (Tr. 26 (emphasis added)), and the ALJ's decision amply explains why Plaintiff's moderate deficit in CPP did not warrant further RFC restrictions. Plaintiff's failure to demonstrate error with respect to the ALJ's function-by-function analysis further distinguishes the instant case from <u>Burton</u>, <u>Karen O.</u>, and <u>Elvis P.</u>, as <u>none</u> of those cases ordered remand under <u>Dowling</u> based <u>solely</u> on the ALJ's recitation of the proper RFC framework in the Applicable Law section rather than the Findings of Fact and Conclusions of Law section of the decision. <u>See</u> <u>Burton</u>, 2023 WL 2731049, at *7 (remanding under <u>Dowling</u>, in part, because "the ALJ's assessment of [the plaintiff]'s RFC contain[ed] too little logical explanation

48

for [the court] to conduct meaningful review" (internal quotation marks and ellipsis omitted)); <u>Karen O.</u>, 2022 WL 2954783, at *6 (finding <u>Dowling</u> error, in part, because the ALJ failed to "explain[] how he resolved the plethora of conflicting evidence in the record or how the RFC account[ed] for relevant work-related functions"); <u>Elvis P.</u>, 2021 WL 870475, at *16 (crediting the plaintiff's <u>Dowling</u> argument, in part, because "[t]he ALJ did not engage in a function-by-function analysis of [the p]laintiff's abilities to sit, stand, walk, lift, and carry" and deeming that error "<u>consequential</u> given [the p]laintiff's testimony that he could only sit for 30 minutes at a time" (emphasis added)).

Based on the foregoing discussion, Plaintiff has not shown that the ALJ erred under <u>Dowling</u>.

## 2. Conflicts Between VE Testimony and <u>DOT</u>

In Plaintiff's second and final assignment of error, she contends that "the ALJ erred by failing to resolve apparent conflicts between the VE's testimony and the information in the [<u>DOT</u>], in violation of SSR 00-4p and case law precedent." (Docket Entry 16 at 17 (bold font and block formatting omitted); <u>see also</u> Docket Entry 19 at 1-5.) More specifically, Plaintiff notes "that the ALJ has an affirmative duty to make an independent identification and resolve any *apparent conflicts* between [VE] testimony and the . . . [<u>DOT</u>] regardless of whether a conflict is identified by the [VE]." (Docket Entry 16 at 17 (italics in

49

original) (citing <u>Pearson v. Colvin</u>, 810 F.3d 204, 208-10 (4th Cir. 2015)).)  According to Plaintiff, "despite finding Dr. Miller's opinion persuasive, supported, and consistent with [her] report, the ALJ failed to include outcome-determinative limitations [from Dr. Miller's report] in the RFC assessment." (<u>Id.</u>)  In Plaintiff's view, "if the RFC had adequately included th[os]e limitations . . ., then the VE's testimony would contain . . . at least three separate and distinct apparent conflicts [that ] were not resolved."  (<u>Id.</u>)  As shown by the following discussion, Plaintiff has not demonstrated that the ALJ failed to identify and resolve any apparent conflicts between the VE's testimony and the <u>DOT</u>.

In the prior discussion of Plaintiff's first assignment of error, the Court rejected Plaintiff's argument that "[t]he ALJ erred by failing to adequately account for the marked/extreme limitations opined by . . . Dr. [] Miller, whose opinion the ALJ found persuasive" (Docket Entry 16 at 12 (bold font and block formatting omitted)).  Plaintiff's conflicts-based arguments thus fail, because they depend on the Court finding to the contrary, i.e., that the ALJ erred by omitting Dr. Miller's limitations from the RFC. (<u>See</u> Docket Entry 16 at 17 ("if the RFC had adequately included the limitations assessed by Dr. Miller's persuasive, supported, and consistent medical opinion, then the VE's testimony would contain . . . at least three separate and distinct apparent

50

conflicts [that ] were not resolved.").)  As well-explained by the
Commissioner:

> Plaintiff contends that there were apparent unresolved
> conflicts regarding her language skills, borderline
> intellectual functioning, intelligence testing, and
> abilities because if Dr. Miller's test results and
> opinions had been properly incorporated into the RFC, the
> [VE] would not have identified the occupations of cook
> [helper], hospital cleaner, and dishwasher as ones that
> a person with Plaintiff's vocational characteristics
> could perform.  This amounts to Plaintiff merely
> rehashing her previous arguments . . . .  That is,
> Plaintiff does *not* identify any conflicts between the
> [VE]'s testimony that an individual with the limitations
> set out in the RFC finding could perform the identified
> occupations and any information in the [DOT].  In the
> absence of any apparent conflicts between the [VE]'s
> testimony and the [DOT], there was nothing for the ALJ to
> resolve.

(Docket Entry 18 at 20 (italics in original).)[14]

---

[14] In Plaintiff's Reply, she raises a new argument that the ALJ erred by
failing to resolve an apparent conflict between the ALJ finding "somewhat
persuasive" (Tr. 30) the state agency psychological consultants' opinions that
Plaintiff had moderate limitation in her ability to carry out detailed tasks (see
Tr. 71, 83), which Plaintiff deems tantamount to limiting her to "understanding
*very short and simple tasks*" (Docket Entry 19 at 3 (italics in original)), and
the DOT's rating of the jobs cited by the VE and adopted by the ALJ at step five
of the SEP at Reasoning Development Level 2 ("RDL 2") (id. at 4 (citing Neeley
v. Commissioner of Soc. Sec. Admin., No. 1:22CV103, 2023 WL 2090289, at *2-3
(W.D.N.C. Feb. 17, 2023) (unpublished))).  The Court will not consider that
argument, because parties cannot advance new arguments for the first time in a
reply brief.  See, e.g., United States v. Williams, 445 F.3d 724, 736 n.6 (4th
Cir. 2006) (declining to consider argument raised for the first time in reply
brief and observing that "this argument comes far too late in the day"); Hunt v.
Nuth, 57 F.3d 1327, 1338 (4th Cir. 1995) (explaining that "courts generally will
not address new arguments raised in a reply brief because it would be unfair to
the [other party]").  Even if considered, Plaintiff's argument would fail,
because a finding of moderate limitation in the ability to understand, remember,
and carry out detailed instructions (see Tr. 71, 82-83) does not equate to a
restriction to very short and simple instructions, as a "moderate" limitation
means mental "functioning in that area independently, appropriately, effectively,
and on a sustained basis is fair," 20 C.F.R. Pt. 404, Subpt. P, App'x 1,
§ 12.00F.2.c (emphasis added), and not that the individual possesses no useful
ability to function in that area.  As a result, the ALJ did not err by failing
to include a limitation to "very short and simple instructions" in the RFC, and
no apparent, unresolved conflict existed between the VE's testimony that an
individual with Plaintiff's RFC could perform the jobs of cook helper, hospital
cleaner, and dishwasher, and the DOT's rating of those jobs at RDL 2.

### III. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE ORDERED** that the Commissioner's decision finding no disability is **AFFIRMED,** and that this action is **DISMISSED** with prejudice.


_____/s/ L. Patrick Auld_____
**L. Patrick Auld**
**United States Magistrate Judge**

February 5, 2024